UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| AMICA CENTER FOR IMMIGRANT RIGHTS,<br>1025 Connecticut Avenue, NW<br>Suite 701<br>Washington D.C., 20036<br><br>    Plaintiff,<br><br> v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,<br>500 12th Street SW, Mail Stop 5900<br>Washington D.C. 20536<br><br>    Defendant. | Case No. _____<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

**INTRODUCTION AND BACKGROUND**

1. Defendant Immigration and Customs Enforcement (ICE) has a great deal of discretion to detain or release noncitizens who are awaiting resolution of their immigration court proceedings outside of those subject to mandatory detention.

2. One of the means of alternative release ICE uses is the Alternatives to Detention (ATD) program as a way to monitor noncitizens it releases into the community.

3. The ATD programs use various forms of electronic monitoring and case management to purportedly attempt to ensure that enrolled individuals comply with their release conditions, including attendance at immigration court hearings. The various forms of alternatives include GPS location monitoring devices such as

1

ankle monitors and the SmartLink phone app; geographic restrictions on movement; curfews; and in-person and telephonic check-ins.

4.  While labeled as an "alternative" to physical detention, ICE's ATD programs are not an actual alternative to detention but rather a different form of ICE custody over noncitizens, including physical restraint on individuals' bodies and movements.

5.  As noted in a 2024 petition for rulemaking to the Department of Homeland Security (DHS) and the Department of Justice (DOJ) from 29 different legal service organizations from across the country, ICE's use of ATD dwarfs its use of detention centers and has rapidly expanded in the past five years.[1]

6.  In Fiscal Year 2020, ICE had approximately 85,415 individuals enrolled in ATD, already over 20,000 more individuals than its current detention numbers.[2] By September 2025, ICE had over 181,000 individuals enrolled in ATD custody—over *3 times* the number of individuals in ICE detention facilities.[3]

7.  The vast majority of individuals in ATD custody are surveilled via the SmartLink phone application (which includes GPS tracking capabilities). Over

---

[1] Amica Center, et. al, *Petition for Rulemaking: Immigration Judge Review of Immigration & Customs Enforcement's Alternatives to Detention Conditions of Supervision* (July 12, 2024) available at http://amicacenter.org/app/uploads/2024/07/Amica-Center-et-al-Petition-for-Rulemaking-re-IJ-review-of-ATD-conditions.pdf
[2] Jose Olivares and Will Craft, *Immigrants with no criminal record now largest group in ICE detention*, The Guardian (Sept. 26, 2025) available at https://www.theguardian.com/us-news/2025/sep/26/immigrants-criminal-record-ice-detention ("There are currently a total of 59,762 in ICE detention across the US.").
[3] *See* DHS ICE, *Detention Management,* (last updated Sept. 25, 2025) data available at https://www.ice.gov/doclib/detention/FY25_detentionStats09252025.xlsx.

30,000 individuals are currently wearing ICE ankle monitors, nearly double the number of people ICE had on ankle monitors at this time last year.[4] Based on recent reporting,[5] ICE issued a new memo regarding ATD attributed to Acting Assistant Director Dawnisha M. Helland of ERO's Non-detained Management/ATD leadership. ICE has yet to make this memo publicly available.

8. While less expensive than physical incarceration, the cost of this technology is also extraordinary. For the various forms of ATD, ICE spends over $235,000 *a day*.[6]

9. This form of ICE custody is also far from short-lived for noncitizens. On average, noncitizens remain in ATD programs 725 days (nearly 2 years), with some regional ICE offices continuing noncitizens' enrollment for nearly 3 years.[7]

10. The harms to noncitizens from ATD custody extend beyond the costly, lengthy, and unnecessary surveillance of their every move. ATD causes serious financial, physical, and psychological damage over these protracted periods. The ankle-monitor devices ICE uses "can disrupt almost every aspect of daily life, from sleeping and exercising to buying groceries and getting a job."[8] The ankle monitors

---

[4] *See id.*
[5] *See* Marianne LeVine, et al., *ICE moves to shackle some 180,000 immigrants with GPS ankle monitors*, WaPo (July 24, 2025) available at https://www.washingtonpost.com/immigration/2025/07/24/ice-check-in-ankle-monitor-immigrants/
[6] *See* DHS ICE, *Detention Management*.
[7] *Id.*
[8] *See* David Yaffe-Bellany, *"It's Humiliating": Released immigrants Describe Life with Ankle Monitors*, Tex. Trib. (Aug. 10, 2018) available at https://www.texastribune.org/2018/08/10/humiliating-released-immigrants-describe-life-ankle-monitors/.

3

can and do result in physical injuries ranging from discomfort to life-threatening symptoms.[9] In one study, nearly 60% of surveyed noncitizens reported that the ankle monitor's impact on their health was severe or very severe, including aggravation of serious pre-existing health conditions like diabetes and leukemia.[10]

11. The harms of ankle monitors are further compounded by the impact on a large majority of noncitizens' mental health, and in some instances, caused them to have suicidal thoughts.[11]

12. Noncitizens subjected to SmartLink monitoring report social isolation, ostracization, and fear that they will cause harm to their communities by bringing in a law enforcement presence, simply from having the application on their phone.[12]

13. As DHS's reporting details, SmartLink monitoring also requires noncitizens to take and send pictures of themselves on a frequent but erratic basis, disrupting basic tasks such as taking their children to school or a doctor's appointment, and at times, told to call or message ICE officials immediately.[13]

14. In a similar vein, location tracking, home arrest, and curfews restrict noncitizen movement to such a degree that it curtails an individual's ability to

---

[9] See Tosca Giustini, et al., Benjamin N. Cardozo School of Law, *Immigration Cyber Prisons: Ending the Use of Electronic Ankle Monitors*, LARC ONLINE PUBLICATIONS 12 (July 2021) available at https://larc.cardozo.yu.edu/faculty-onlinepubs/3/ ("Immigration Cyber Prisons").
[10] *Id.* at 14.
[11] *Id.* 14-16.
[12] *Id.* at 16.
[13] 5 U.S. Department of Homeland Security, Privacy Impact Assessment for the Alternatives to Detention (ATD) Program 14-17 (March 17, 2023) available at https://www.dhs.gov/sites/default/files/2023-08/privacy-pia-ice062-atdaugust2023.pdf

participate in and maintain steady employment.[14] This, in turn, exposes noncitizens, their families, and communities to additional unnecessary risks of housing and food insecurity.

15. Despite the many harms that stem from ATD custody, there is effectively no oversight by a neutral arbiter of ICE's operation of its ATD programs. Immigration Judges can only review ATD conditions in the narrowest of circumstances—only for those individuals who have not received a removal order, and only then if the noncitizen files a motion *within seven days* of being released from ICE's physical custody. *See* 8 C.F.R. § 236.1(d)(1); 8 C.F.R. § 1236.1(d)(1). After that, ICE alone holds the keys. *Id.* at § 236.1(d)(2); § 1236.1(d)(2). And noncitizen requests to ICE for amelioration of their custody conditions "are frequently met with silence or bare acknowledgement from ICE . . . ."[15] By refusing to decide on these requests, ICE deprives individuals in ATD custody of their due process and ability to appeal to the Board of Immigration Appeals. See 8 C.F.R. § 236.1(d)(3)(ii); 8 C.F.R. § 1236.1(d)(3)(ii). Taken together, the harms inflicted by ATD custody are not only profound and expensive but leave most noncitizens without legal recourse.

16. Despite ICE's stated goals of using ATD custody to ensure noncitizen compliance with immigration laws, several reports have found that ICE had *lower*

---

[14] *Immigration Cyber Prisons* at 19-20.
[15] Amica Center, et. al, *Petition for Rulemaking* at 2.

compliance rates, particularly where other supportive alternatives exist, such as community-based case management.[16]

17.　　As the American Bar Association has reported, in both application and substance, ATD custody is "punitive in nature because it is imposed without objective assessment of either need or risk in a one-size-fits-all approach. Indeed, the current, and increasingly widespread, misuse of monitoring may violate constitutional standards guaranteeing liberty and due process."[17]

18.　　Adding to the lack of oversight, ICE only publicly provides a handful of documents regarding its processes around ATD custody that are woefully outdated. The last publicly available version of the ICE ATD handbook was created in August 2017 (and was only obtained via FOIA litigation). Its memorandum regarding GPS monitoring of pregnant or medically vulnerable individuals was published in September 2009. Defendant's ATD enrollment guidance was published in June 2005.[18]

---

[16] *See* American Bar Association Commission on Immigration, *Electronic Monitoring of Migrants: Punitive not Prudent* at 25-26 (Feb. 2024) ("Punitive not Prudent"), https://www.americanbar.org/content/dam/aba/administrative/immigration/electronic-monitoring-report2024-02-21.pdf; Women's Refugee Commission, "The Family Case Management Program: Why Case Management Can and Must Be Part of the US Approach to Immigration," (June 2019), available at https://www.womensrefugeecommission.org/wp-content/uploads/2020/04/The-Family-Case-ManagementProgram.pdf (finding that the Family Case Management Program achieved a 99% compliance rate with ICE and immigration court requirements).
[17] *See* American Bar Association, *Electronic Monitoring of Migrants* at 4.
[18] *See* ICE FOIA Library, "Alternatives to Detention Handbook – Intensive Supervision Appearance Program" (Aug. 16, 2017) available at https://www.ice.gov/doclib/foia/policy/handbookATD_08.16.2017.pdf; "Alternatives to

6

19. Given the tremendous increase and impact of ATD custody on noncitizens' lives, health, and access to due process, Plaintiff Amica Center for Immigrant Rights (Amica Center) seeks updated records related to ICE's internal guidance, policies, and memoranda surrounding ATD custody.

## JURISDICTION AND VENUE

20. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 552(a)(4)(B). Plaintiff's request for declaratory and other relief is properly subject to this Court's subject-matter jurisdiction pursuant to 5 U.S.C. §§ 552(a)(4)(F), 701-06 and 28 U.S.C. §§ 1331, 2201(a), and 2202.

21. Venue is proper within this district under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. §§ 1391(b)(1), (b)(2), and (e)(1) as Plaintiff has its principal place of business in this District.

22. Plaintiff has constructively exhausted all administrative remedies in connection with its FOIA requests, as detailed below.

23. Because Plaintiff brings this action after constructively exhausting administrative remedies, this Court's jurisdiction is based on 5 U.S.C. § 552(a)(4)(B) and 5 U.S.C. § 552(a)(6)(A)(i).

24. Under FOIA, this Court may retain jurisdiction and allow Defendant additional time to complete the processing of Plaintiff's FOIA requests if, and only

---

Detention (ATDP) Enrollment Guidance (Jun. 28, 2005) available at https://www.ice.gov/doclib/foia/policy/mmeoATD_Programs_06.28.2005.pdf; "Use of GPS Monitoring Devices on Persons who are Pregnant or Diagnosed with a Severe Medical Condition" (Sept. 14, 2009) available at https://www.ice.gov/doclib/foia/policy/memoGPS_MonitoringMedical_09.14.2009.pdf.

7

if, the government can demonstrate that exceptional circumstances exist ***and*** their due diligence in responses to Plaintiff's requests. Because Defendant can demonstrate neither, this Court has jurisdiction to declare unlawful the agencies' withholdings and order immediate production of records unlawfully withheld.

## PARTIES

25. Plaintiff Amica Center is a 501(c)(3) nonprofit organization that provides legal services to noncitizens in ICE custody across the country. Originally started as a project of the Washington Lawyers' Committee for Civil Rights and Urban Affairs, Amica Center became an independent non-profit organization in 1999. Amica Center's mission is to confront the impact that the unjust immigration system has on its clients and communities through direct legal representation, impact litigation, education, and client-centered advocacy. In addition to providing direct representation to immigrant communities, Amica Center publishes critical information on noncitizen rights, issues press releases, and shares analyses with journalists, policymakers, and the public through newsletters, its website, and social media channels.

26. ICE is a federal agency within the meaning of FOIA, 5 U.S.C. § 552(a)(1)(f). ICE has possession, custody, and control of records responsive to Plaintiff's requests.

27. Plaintiff seeks a declaration that Defendant ICE has improperly withheld records that will shed light on the agency's increased use and its procedures regarding ATD custody.

**FACTS**

28.     On August 13, 2024, Plaintiff Amica Center filed a FOIA request with ICE via its SecureRelease online portal. The request sought, *inter alia,* copies of any handbook, policy manual, standard operating procedure, or similar records that ICE employs in the operation of its Extended Case Management Services (ECMS), which was then part of its ATD programs. ICE assigned it a request number of 2024-ICFO-51484 ("First Request"). Plaintiff also sought a fee waiver, which ICE granted. Plaintiff's First Request and subsequent correspondence with ICE are attached as Exhibit A.

29.     That same day, Plaintiff filed a second request seeking updates or new versions of a number of outdated ATD policies, memoranda, and guidance, as well as any other records that ICE has issued relating to ATD since August 17, 2017. ICE assigned it a request number of 2024-ICFO-51485 ("Second Request). Plaintiff also sought a fee waiver, which ICE granted. Plaintiff's Second Request and correspondence with ICE are attached as Exhibit B.

30.     Upon information and belief, ICE has updated and amended some or all of the aforementioned handbook, guidance, policies, memoranda, and other materials related to ATD custody of noncitizens.

31.     With respect to both requests, Plaintiff followed up with ICE on November 19, 2024, and again on October 10, 2025, and received no response from ICE. *See* Ex. A at 2, Ex. B at 2.

32. More than fourteen months later, ICE has not made a determination on the First or Second FOIA requests and has not produced a single record in response to either request.

33. Plaintiff has constructively exhausted its administrative remedies as to both FOIA requests.

34. At the time of this filing, ICE has not conducted a search for records responsive to either of Plaintiff's requests.

35. ICE has not made a decision or otherwise taken action on Plaintiff's requests that could be appealed. ICE has not indicated to Plaintiff what records it intends to produce and what records it intends to withhold.

36. ICE has failed to make the records responsive to Plaintiff's request promptly available.

37. ICE has violated the timing provisions of FOIA with respect to Plaintiff's requests.

38. ICE has an ongoing pattern and practice of improperly withholding records from Plaintiff in violation of FOIA.

39. Under FOIA, ICE has a duty to affirmatively disclose up-to-date information regarding its policies, procedures, memoranda, and other documentation surrounding its use of ATD custody.

//
//
//

## CLAIMS FOR RELIEF

### COUNT ONE
### Failure to make a determination in violation of FOIA

40. Plaintiff incorporates the allegations in the paragraphs above as though fully set forth here.

41. Defendant and its components are obligated under 5 U.S.C. § 552(a)(6) to make a determination with respect to Plaintiff's requests within the statutorily mandated time period of 20 business days, to be extended by no more than 10 business days in the event that the agency notifies the requester in writing of the existence of "unusual circumstances." When Defendant failed to make a determination or respond to a FOIA request within the statutory deadline, it constructively denied the request. *See Oglesby v. U.S. Dep't of Army* 920 F.2d 57 (D.C. Cir. 1990) ("Congress adopted the time limit provision in the FOIA in order to 'contribute to the fuller and faster release of information, which is the basic objective of the Act.'" (quoting H.R. Rep. No. 93-876, 93d Cong. 2d Sess., reprinted (1974) U.S. Code Cong. & Ad. News 6267 at 6271).

42. Defendant and its components have a pattern or practice of failing to make determinations regarding FOIA requests within the statutory time period. No legal basis exists for the Defendant's pattern or practice of failing to meet the statutory determination and time period requirements with respect to FOIA requests they receive.

//

//

## COUNT TWO
### Failure to conduct an adequate search in violation of FOIA

43. Plaintiff incorporates the allegations in the paragraphs above as though fully set forth here.

44. Plaintiff properly requested records within the possession, custody, and control of Defendant.

45. Defendant has not produced any documents in response to the Request and has not communicated a determination as to Plaintiff's requests.

46. Defendant and its subcomponents are obligated under 5 U.S.C. § 552(a)(3)(C) to conduct a reasonable search for records responsive to Plaintiff's requests within FOIA's timing requirements.

47. Defendant has not conducted a "search reasonably calculated to uncover all relevant documents" pursuant to Plaintiff's detailed and specific requests. Defendant is also required and has failed to "make reasonable efforts to search for the records in electronic form or format." 5 U.S.C. § 552(a)(3)(C).

48. Defendant has also failed to determine a production scope and which records it intends to withhold and which it intends to produce.

49. Defendant has a pattern or practice of failing to conduct an adequate search for responsive records to FOIA requests within FOIA's timing requirements. No legal basis exists for Defendant's pattern or practice of failing to meet the statutory deadline with respect to conducting an adequate search.

50. Plaintiff is entitled to declaratory and injunctive relief requiring Defendant to promptly search for and produce all responsive non-exempt records

and provide indexes justifying any withholding of responsive records they believe are exempt.

## COUNT THREE
### Wrongful withholding of non-exempt responsive records

51. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

52. Plaintiff properly requested records within the possession, custody, and control of Defendant.

53. Defendant is improperly withholding non-exempt agency records by failing to produce the non-exempt records responsive to the Plaintiff's requests.

54. Defendant is improperly withholding non-exempt agency records responsive to Plaintiff's requests by failing to segregate exempt information in otherwise non-exempt agency records.

55. Defendant's failure to provide all non-exempt responsive records violates FOIA.

56. Plaintiff is entitled to declaratory and injunctive relief requiring Defendant to promptly produce all non-exempt records responsive to Plaintiff's FOIA requests, segregate all exempted information in otherwise non-exempt records, and provide indexes justifying the withholding of any responsive records they argue are exempt.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the Court to:

a. Declare, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that Defendant violated the Freedom of Information Act, 5 U.S.C. § 552;

b. Declare that Plaintiff is entitled to a determination on its requests from Defendant;

c. Declare that Plaintiff is entitled to disclosure of the requested records;

d. Declare that Defendant has failed to conduct an adequate search for responsive records and has failed to segregate and produce any non-exempt portions of those records;

e. Order Defendant to begin searching for responsive records to Plaintiff's requests;

f. Order expeditious proceedings in this action pursuant to 5 U.S.C. § 552; 28 U.S.C. § 1657; and FRCP 12(a)(2) (Courts are not required to automatically accord expedited treatment to a FOIA lawsuit; however, as with other civil actions, they may do so "if good cause therefore is shown.");

g. Order Defendant to prepare an index pursuant to *Vaugh v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1974), for any documents it seeks to withhold under a FOIA exemption;

h. Enjoin Defendant from continuing to withhold any and all non-exempt records responsive to Plaintiff's requests;

i. Retain jurisdiction of this action to ensure that no agency records are improperly withheld;

j.  Award Plaintiff attorneys' fees and litigation costs incurred in this action, pursuant to 5 U.S.C. § 552(a)(4)(E); and

k.  Order such other relief as the Court may deem just and proper.

Dated: November 5, 2025                              Respectfully Submitted,

By: /s/ Daniel Melo

Daniel Melo
The Melo Law Firm
NC Bar # 48654
2920 Forestville Road, Ste 100
PMB 1192
Raleigh, NC 27616
Tel: (919) 348-9213
dan@themelolawfirm.com
*Pro Bono Counsel For Plaintiff*